**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

THE ESTATE OF MONIQUE GALLEGOS, by and through personal representative
ALBERT GALLEGOS,
DANESSA GARCIA-GALLEGOS, and
A.G. and Y.G., minor heirs by and through next friend ALBERT GALLEGOS

       Plaintiffs,

v.

GEO GROUP, INC.,
COMMUNITY EDUCATION CENTERS, INC.,
ARAPAHOE COUNTY RESIDENTIAL CENTER,
KRISTIN RUTZ,
KRISTIN TALMADGE,
STEVEN FRANK,
RAYDAWN CARTER,

       Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

       Plaintiffs the Estate of Monique Gallegos by and through personal representative Albert Gallegos, Danessa Garcia-Gallegos, and minor heirs A.G. and Y.G., by and through next friend Albert Gallegos, through counsel of the law firm MAXTED LAW LLC, submit this Complaint and Jury Demand:

**I.  INTRODUCTION**

       1.     Monique Gallegos died a tragic and preventable death by methamphetamine toxicity on June 13, 2023, while in the care of the Arapahoe County Residential Center ("ACRC"), serving a community corrections sentence. That day,

multiple ACRC staff watched Ms. Gallegos suffer alarming drug overdose symptoms

and observed her obvious need for emergency medical care. For approximately an

hour, they watched Ms. Gallegos suffer increasing hyperactivity, agitation,

uncontrollable movements, and other red flag symptoms, and they knew the likely

cause was methamphetamine. Making even more obvious the risks, Defendants knew

Ms. Gallegos had relapsed on methamphetamine and fentanyl, had used the

substances within ACRC, and had overdosed the night before while in the facility.

2.      Yet, staff failed to promptly call for emergency help, delaying and denying

Ms. Gallegos urgently needed life-saving medical care in deliberate indifference to the

risks to Ms. Gallegos's health and life. By the time Defendants finally sought help, it was

too late. When emergency medical responders arrived, Ms. Gallegos was already

unresponsive and suffering cardiac arrest. She was never revived and died in an office

at the ACRC facility.

3.      Mr. Gallegos was a beloved mother and grandmother. Her life had value

and her death was preventable. Had ACRC staff promptly called 911, medical first

responders would have arrived within minutes, and life-saving care would have been

administered. She would have been stabilized and transported to a hospital, where she

would have survived this methamphetamine toxicity emergency.

4.      Defendants' failures leading to this death are inexcusable. ACRC, as a

substance abuse residential reentry center operated by Defendants GEO Group

("GEO") and Community Education Centers ("CEC"), contracted to provide community

corrections "inmates" a safe, structured, supervised environment. That specifically

included safely housing and ensuring access to necessary care for those who suffered Substance Abuse Disorder ("SUD"), including Ms. Gallegos.

5.    As owners and operators of a substance abuse residential community corrections facility, Defendants knew risk of relapse is an inevitable part of recovery, and they knew the life-threatening dangers of overdose and toxicity Ms. Gallegos faced as a person suffering SUD. As alleged below, they further knew Ms. Gallegos was in crisis and had already relapsed on methamphetamine, had a recent overdose incident the night before her death in the ACRC facility, and was in an extremely vulnerable state. Despite knowing the clear dangers of overdose, and despite witnessing the obvious symptoms of methamphetamine toxicity on June 13, Defendants failed in their duty to provide access to emergency care, in deliberate indifference to Ms. Gallegos's health and life.

6.    Defendants had a duty to ensure Ms. Gallegos had access to such necessary and life-saving emergency medical care, yet they failed to provide it, delaying and denying needed care in known and obvious deliberate indifference to the serious risks to Ms. Gallegos's life and health

7.    Defendants violated Ms. Gallegos's constitutional rights and are liable for the damages caused under 42 U.S.C. § 1983, and they are liable under Colorado state law for her wrongful death.

## II.  JURISDICTION AND VENUE

8.    This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution, 42 U.S.C. § 1983 and §

1988, and under Colorado state law.

9.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

10.    Personal jurisdiction over each of the Defendants is conferred under Federal Rule of Civil Procedure 4.

11.    Supplemental jurisdiction over state claims is conferred by 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and meritorious and the state causes of action arise from a common nucleus of operative facts.

12.    Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391, as the district where all relevant events and omissions occurred.

### III.  PARTIES

13.    Plaintiff the Estate of Monique Gallegos ("Estate") is a party in interest following the death of Monique Gallegos, a Colorado resident. The Estate appears through its personal representative Albert Gallegos, the father of Monique Gallegos.

14.    Plaintiff Danessa Garcia-Gallegos is the daughter of Monique Gallegos, a resident of Colorado, and a citizen of the United States.

15.    Plaintiffs A.G. and Y.G. are minor children of Monique Gallegos, residents of Colorado and citizens of the United States, and they appear through next friend Albert Gallegos.

4

16.     Defendant GEO Group, Inc. ("GEO") is a Florida corporation with its principal address located at 4955 Technology Way, Boca Raton, Florida, 33431. GEO owns and operates Community Education Centers and ACRC.

17.     Defendant Community Education Centers, Inc., ("CEC") is a Florida corporation owned by GEO with its principal address located at 4955 Technology Way, Boca Raton, Florida, 33431. Its Colorado registered agent is Corporate Creations Network Inc. located at 155 E. Boardwalk #490, Fort Collins, CO, 80525. CEC is owned by GEO, and on information and belief owns and operates ACRC as a subsidiary of GEO.

18.     Defendant Arapahoe County Residential Center LLC ("ACRC") is a company owned and operated by Defendants GEO and CEC. Its Colorado registered agent is Corporate Creations Network Inc. located at 155 E. Boardwalk #490, Fort Collins, CO, 80525. The facility ACRC is physically located at 2135 W. Chenango Ave., Littleton, Colorado, 80120.

19.     Defendants GEO, CEC, and ACRC, are hereinafter collectively referred to as the GEO Defendants.

20.     At all times relevant to the subject matter of this litigation, GEO Defendants contracted with Arapahoe County to provide medical, mental health, and substance abuse services to people held at ACRC. At all relevant times, GEO Defendants were responsible for the oversight, supervision, and training of all of its staff at ACRC, including the Individual ACRC Defendants, and for the medical care of people in their care at ACRC.

5

21.     At all relevant times, Defendants were acting under color of state law and performing a public function of the state in operating a community corrections facility, a residential housing and providing services to people serving criminal sentences.

22.     Defendant GEO is a private corporation, and thus neither it nor any of its employees or contractors are entitled to any immunity under the Colorado Governmental Immunity Act on Colorado ("CGIA") state law claims or qualified or any other immunity on the federal law claims.

23.     Defendant Kristin Rutz was at all times relevant an employee of GEO working in the ACRC facility in her official capacity under color of law. She is sued in her individual capacity.

24.     Defendant Kristin Talmadge was at all times relevant an employee of GEO working in the ACRC facility in her official capacity under color of law. She is sued in her individual capacity.

25.     Defendant Steven Frank was at all times relevant an employee of GEO working in the ACRC facility in his official capacity under color of law. He is sued in his individual capacity.

26.     Defendant Raydawn Carter was at all times relevant an employee of GEO working in the ACRC facility in his official capacity under color of law. He is sued in his individual capacity.

27.     Defendants Rutz, Talmadge, Frank, and Raydawn Carter are hereinafter collectively referred to as the "ACRC Defendants" or the "Individual Defendants."

**IV.  FACTUAL ALLEGATIONS**

**Monique Gallegos Was A Beloved Mother And Grandmother**

28.    When Monique Gallegos died a preventable death in ACRC, she left behind six daughters, two sons, and three grandchildren. While she had a large, loving family, she was only 35 years old at the time of her death.





29.    Ms. Gallegos survived trauma as a child which led to mental health disorders and a struggle with SUD. Ms. Gallegos's suffering from mental health conditions and SUD led to contact with the criminal legal system. While serving a prison

term in the Colorado Department of Corrections, Ms. Gallegos was ordered to intensive SUD treatment at ACRC as part of that criminal sentence. At the time of her death Ms. Gallegos was serving that criminal sentence.

30.     Ms. Gallegos enthusiastically participated in her own recovery. She worked to strengthen her relationships by taking accountability for the way her SUD impacted those around her. Ms. Gallegos frequently reached out to her children to share with them the lessons she'd learned and the hope she had for them and their futures.

31.     Recovery is not a straight line, and relapse was a predictable part of her recovery process, as it is for anyone with SUD. Ms. Gallegos unnecessarily died of an overdose at a time in which she'd made strides forward in her battle towards recovery. While she relapsed in ACRC's care, she did not deserve to die for that symptom of her SUD.

**GEO Defendants Provided Community Corrections Services And Had Contractual And Legal Duties To Ms. Gallegos**

32.     Similar to a private prison, GEO Defendants contracted with the government to serve a quintessential state function, the provision of a community corrections residential facility for individuals to serve criminal sentences under Colorado state law.

33.     Under Colorado law, local governments operate community corrections programs under state oversight through the Colorado Department of Corrections and Colorado Department of Criminal Justice. Pursuant to state law, individuals placed in

8

community corrections programs serve a portion of their criminal sentence in the community corrections facility and under its staff's supervision.

34.    GEO Defendants contracted to provide this function through a subcontract. Arapahoe County entered into a contract with the state of Colorado provide community corrections services, pursuant to Title 17, Article 17, Section 103 and C.R.S. 18-1.3-301. The County then subcontracted with GEO Defendants pursuant to these laws.

35.    GEO Defendants agreed to be compensated at a daily rate of $67.67 per "offender" for residential placements. At all times relevant, on information and belief, ACRC housed over 100 individuals within the facility.

36.    GEO Defendants agreed to provide services necessary for persons serving criminal sentences, including sex offender treatment, mental health treatment, substance abuse treatment, dual-diagnosis treatment, cognitive-behavioral treatment, and domestic violence treatment.

37.    GEO Defendants agreed to provide other services necessary for persons serving sentences, including education and GED courses and employment courses.

38.    GEO Defendants agreed to ensure "offenders" serving sentences at ACRC receive the exact Substance Abuse Treatment and dosages the "offenders" were assessed as needing. For "offenders" assessed as needing Intensive Residential Treatment, ACRC agreed to refer them to a program authorized by the Colorado State Department of Criminal Justice.

39.    GEO Defendants agreed to focus on "reducing offender risk and

recidivism" as set forth by the National Institute of Corrections, and to utilize tools and matrices designed for state corrections systems to achieve this.

40.     GEO Defendants agreed to ensure they provided necessary training to their staff, including contracting that they "shall ensure that its administration, supervisory, case management and security staff is provided with and participates in adequate, ongoing training specific to supervising the offender population(s) it accepts into its residential and non-residential programs." This contractually bound GEO Defendants to ensure training to staff for supervising individuals like Ms. Gallegos who suffer from chronic SUD and the related risks of drug toxicity and overdose as alleged herein. GEO Defendants failed to meet this contractual duty, in deliberate indifference to the risks, as alleged herein.

41.     GEO Defendants agreed to utilize funds to provide substance abuse and other treatment for individuals with SUD like Ms. Gallegos, including a wide-range of treatment protocols and approaches to substance abuse and addiction.

42.     GEO Defendants agreed to comply with state law and regulations governing community corrections facilities in which people serve criminal sentences, including the Colorado Community Corrections Standards, Title 17 Article 27, and C.R.S. § 18-1.3-301.

43.     GEO Defendants agreed to provide 24 hours a day, seven days a week staff supervision of "offenders" serving sentences within the facility, consistent with Colorado Community Corrections Standards.

44.     GEO Defendants agreed to provide access to necessary medical care,

including medical emergencies requiring hospitalization, for "offenders" serving sentences in the facility.

45.    GEO Defendants was responsible for implementing necessary policies, procedures, training, and supervision for its staff to operate the facility consistent with the law and the constitutional rights of those serving sentences within the facility.

46.    GEO Defendants had a duty to ensure Ms. Gallegos's safety and the protection of her civil rights, including:

   a.  A duty to maintain written policies and procedures with a primary focus of maintaining safety for facility "inmates", staff, and visitors;

   b.  A duty to provide a safe, sanitary environment;

   c.  A duty to provide adequate hygiene and bathroom and shower facilities;

   d.  A duty to provide drug testing, including for amphetamines (*i.e.,* methamphetamine);

   e.  A duty to provide access to emergency medical services and access to transport by ambulance if necessary to a hospital or emergency department and to report to the state regarding such incidents, including where due to overdose or significant risk to loss of life.

47.    By contract and under state law and Colorado Community Corrections Standards, GEO Defendants had a duty to protect the constitutional rights of "inmates" housed by ACRC serving criminal sentences like Ms. Gallegos, including the rights to access to necessary medical care and to be free from cruel and unusual punishment.

48.    GEO Defendants, in operating this community corrections facility, performed a public function traditionally reserved for the state: housing and providing services to individuals serving criminal sentences.

49.    GEO Defendants and the Individual Defendants had a special relationship with Ms. Gallegos that imposed a heightened duty of care to provide for the welfare and safety of persons in their custody, including Ms. Gallegos.

**Individual Defendants Knew Ms. Gallegos Was In Crisis And Had Relapsed With Methamphetamine And Other Substances**

50.    When Ms. Gallegos was booked into ACRC in October of 2022, she openly acknowledged her struggles with SUD, and specified to ACRC staff that she struggled with methamphetamine as well as fentanyl. She specified during intake that her drug of choice was amphetamines, to include methamphetamine. Ms. Gallegos was to serve her sentence housed at ACRC specifically because they purportedly specialized in the SUD treatment Ms. Gallegos needed for recovery. Individual Defendants were all aware of Ms. Gallegos's background through her intake records and interacting with her for the months she was housed at ACRC prior to her death.

51.    Ms. Gallegos told ACRC staff, as Individual Defendants knew, that her SUD involved periods of recovery and relapse. This was documented in Ms. Gallegos's files and the Individual Defendants knew she was in ACRC for SUD treatment, including for methamphetamine. The Individual Defendants knew that Ms. Gallegos's drug of choice included methamphetamine at all times relevant to her death.

52.    It is also common knowledge and was known to all Individual Defendants

that relapse is a part of recovery, and that relapse can involve returning to instances of use and abuse of substances including methamphetamine. They all knew relapse is dangerous as it can result in overdose or toxicity emergencies, making it particularly important to be vigilant when residents with SUD like Ms. Gallegos may have relapsed.

53.     On June 10-11, 2023, days before her death, Ms. Gallegos left ACRC on an overnight pass to her girlfriend's house. Ms. Gallegos overstayed and was written up by staff in a report dated June 12, 2023. Staff noted "it was believed by staff that Monique may have used controlled substances during this time prior to returning to the facility." Ms. Gallegos also admitted in writing that she used methamphetamine and fentanyl while outside the facility on this trip to her girlfriend's house. Individual Defendants were aware of this information at all times relevant to Ms. Gallegos's death.

54.     Individual Defendants also knew that Ms. Gallegos reported to ACRC staff that she had overdosed on drugs the night before within the ACRC facility.

55.     Individual Defendants all knew Ms. Gallegos was in a relapse crisis as a symptom of her SUD, that she had relapsed including involving methamphetamine and fentanyl, that she'd already suffered an overdose event, and that in this state she faced life-threatening dangers.

56.     The Individual Defendants all knew that a person with a substance abuse disorder like Ms. Gallegos, in a state of relapse, is especially vulnerable to continued relapse and at particularly risk of fatal overdose or intoxication.

57.     Despite knowledge that this was a full-blown relapse crisis, including an overdose, ACRC staff, including the Individual Defendants, failed to take prompt action

13

to protect and ensure Ms. Gallegos received treatment during this critical time period.

**June 13—Defendants Watch Monique's Alarming Symptoms
As She Horrifically Dies**

58.    Mid-day on June 13, 2023, Ms. Gallegos suffered a medical emergency and died inside ACRC while staff, including the Individual Defendants, watched, inexplicably failing to call for an ambulance or otherwise ensure she had access to life-saving care.

59.    Ms. Gallegos's horrific death was captured on ACRC surveillance footage. The video shows a chilling scene of Ms. Gallegos slowly and visibly dying in front of Individual Defendants while for about an hour her symptoms worsen as they failed to call for emergency medical care.

60.    For that hour-long time period, Ms. Gallegos remained in a lobby and office area of ACRC, where Individual Defendants and other ACRC staff were located at desks or performing various tasks, where she was able to communicate and show her symptoms. Individual Defendants had every opportunity and duty to immediately call 911 or otherwise ensure emergency medical care was provided during this time period.

61.    The morning of June 13, around 10:30am, Ms. Gallegos had a visit at ACRC with her girlfriend—the same person Defendants knew Ms. Gallegos had visited days prior when she relapsed on drugs and overdosed.

62.    Soon after her girlfriend arrived for the visit, Ms. Gallegos began showing alarming symptoms of drug toxicity. These symptoms included visible physical agitation and movement, obvious distress, hyperactivity, paranoia, uncontrollable movement, and

14

other visible symptoms of methamphetamine or "speed" toxicity.

63.    At about 11:00am on June 13, Defendant Rutz informed Defendant Talmadge in an ACRC office that she was concerned about Ms. Gallegos's behavior, and that she was acting strange. Also, around that time, Ms. Gallegos made statements to staff admitting to having used drugs. Particularly given Ms. Gallegos had just relapsed and reportedly overdosed, Individual Defendants knew Ms. Gallegos was likely experiencing effects of a substance, likely methamphetamine, her known drug of choice.

64.    By 11:08am, Ms. Gallegos's behavior indicated methamphetamine toxicity and distress. A portion of video surveillance shows Ms. Gallegos in visible distress, placing her face in her hands, unstable leaning against a fridge while she interacts with her girlfriend:



65.    Around 11:20am, Defendant Rutz continued to observe indications Ms. Gallegos was suffering drug toxicity, that she was not acting herself and was in distress.

15

66.     Around that time, Defendant Rutz also heard Ms. Gallegos state to her girlfriend words to the effect of, "what the fuck did you put in my orange juice?", a major red flag Ms. Gallegos was experiencing drug toxicity. Defendant Rutz shared this information with other Individual Defendants.

67.     All Individual Defendants knew residents of ACRC in relapse, or their guests, may conceal drugs into the facility, making it essential to be on alert for potential incidents of use or overdose. Individual Defendants also knew Ms. Gallegos, by asking "what the fuck did you put in my orange juice," was indicating she'd been exposed to or taken possession of a potentially dangerous substance, obviously to include potentially methamphetamine or fentanyl.

68.     Throughout this time period, Ms. Gallegos walked around the office, lobby area, and adjacent hallway, interacting with ACRC staff and the Individual Defendants.

69.     Ms. Gallegos's statement and behavior by this point made clear to Defendants Ms. Gallegos was experiencing toxicity from a substance, that she was in distress due to the effects.

70.     Individual Defendants also knew and observed the substance affecting Ms. Gallegos was likely methamphetamine, or similar dangerous stimulant, given Ms. Gallegos's agitated, uncontrollable movements and the distress she was visibly suffering.

71.     At 11:32am, Defendant Frank observed Ms. Gallegos increasingly and visibly distressed, fidgeting, and agitated, consistent with toxicity of methamphetamine. He observed Ms. Gallegos fidgeting with her hands and body, twisting her hands, and

darting her eyes, indicating physical distress and toxicity.

72.    At 11:38am, Ms. Gallegos' distress and agitation continued in the lobby and was closely observed by Defendant Frank. Ms. Gallegos is seen making a praying motion with her hands and fidgeting, indicating she is in distress and needs help.



73.    At 11:40am, Ms. Gallegos spoke with several other ACRC staff, continuing to manifest visible, obvious signs of distress, putting her hand over her mouth, clenching fists, agitated, and visibly suffering. Defendant Carter observed this behavior, and Ms. Gallegos also apologized to Defendant Carter and ACRC staff for the incident that was occurring, once again indicating some substance had been ingested which was adversely harming Ms. Gallegos.

74.    At 11:43am, Ms. Gallegos's methamphetamine agitation continued to increase, she spoke with staff for several more minutes, now clenching at the mouth, lurching out her hand in a seeming uncontrollable movement.



75.    Through 11:45am, Ms. Gallegos's distress continued to escalate in the lobby, and she placed her hands over her stomach, uncontrollably moving, in apparent pain and visible suffering, then pulling her overshirt partially off, clenching at the mouth, and reaching out in an apparent request for help.



76.    Moments later, at 11:45am, Defendant Carter entered the lobby and Ms. Gallegos's distress continued to increase, she was unsteady, clenching and covering her mouth, making uncontrollable movements, in increasingly alarming symptoms of

drug toxicity.



77.     At 11:46am, Defendants Carter, Talmadge, Frank, and other ACRC staff watch closely watch Ms. Gallegos's increasing symptoms, addressing her as Ms. Gallegos continues to shake uncontrollably, making agitated movement, clenching, fidgeting, covering her mouth. Numerous ACRC staff in the lobby witness what is obviously a woman in a medical crisis, a substance toxicity event they know likely involves methamphetamine.





78.    At 11:48am, further indicating their knowledge Ms. Gallegos was
experiencing a medical crisis and toxicity, Defendants Talmadge, Frank, and Carter
escorted her into an office adjacent to the lobby. Ms. Gallegos continued to demonstrate

20

symptoms of toxicity and medical emergency, she is unsteady, moving uncontrollably, rocking back and forth, raising her arms in bizarre movement, legs shaking, in extreme distress and visible medical crisis.



79.     At 11:49am, Defendants Carter, Frank, and Talmadge continued to watch as Ms. Gallegos's distress continues to escalate, rocking back and forth, making praying motions consistent with begging for help, reaching out as if needing help, uncontrollably moving, and indicating her medical crisis and drug toxicity.



80.    At 11:50-11:53am, all Individual Defendants continue to watch as Ms. Gallegos is convulsing, in visible pain, rocking, shaking uncontrollably, banging her hands together, and continuing to exhibit a medical crisis.



81.     At 11:56am, Defendants Talmadge and Frank appear to communicate verbally (there is no audio to the recording), and Defendant Rutz called 911.

82.     No Individual Defendant or other ACRC staff called for medical or emergency care for Ms. Gallegos prior to 11:56am even though for nearly an hour up to that point Ms. Gallegos had exhibited symptoms and made numerous statements making obvious and known to all that she was suffering from a substance, a potential overdose, and in a medical emergency.

83.     In her 911 call, Defendant Rutz failed to specifically ask the dispatcher for an ambulance or explain Ms. Gallegos needed emergency medical care for drug overdose or toxicity. Defendant Rutz initially requested "medical," but then stated "police" were needed, and went on to misrepresent the incident as a resident being "verbal" with staff. And Defendant Rutz then stated there was ""a female here on some kind of drugs just out of control right now, just out of her mind, out out out." Defendant Rutz went on tell the dispatcher that Ms. Gallegos had admitted to using drugs, specifically to include methamphetamine (and fentanyl), and that she had overdosed last night in the facility.

84.     Defendant Rutz failed to request an ambulance or emergency care for Ms. Gallegos, failed to describe her visible alarming symptoms of methamphetamine overdose to the 911 dispatcher. She instead misrepresented the incident as a seeming disturbance, with an "out of control" resident.

85.     Defendant Rutz's misstatements and failure to accurately or plainly state an emergency required urgent medical care, led the dispatcher to send police officers to

23

respond because the issue was a behavioral disturbance rather than a medical emergency.

86.     When the 911 dispatcher told Defendant Rutz police officers—not emergency medical responders—were heading to the facility, Defendant Rutz failed to request emergency medical responders, once again falsely confirming to the 911 dispatcher that police were needed for a disturbance and falsely indicating there was no medical emergency.

87.     Defendant Rutz also admitted a lack of training or preparation for this critical duty of calling 911, stating "I apologize that I am not more prepared" to the dispatcher when asked about basic information about Ms. Gallegos.

88.     Further conveying to the 911 dispatcher that the incident was a disturbance and not a medical emergency, rather than expressing Ms. Gallegos's symptoms or the emergency at hand, Defendant Rutz laughed during what should have been a serious call, quipping "I just think there's a lot going on with her," speaking of Ms. Gallegos.

89.     As the approximately 4 minute 911 call concluded, the 911 dispatcher again told Defendant Rutz that police officers were on the way—not emergency medical responders—and Defendant Rutz once again failed to request an ambulance or emergency medical response, again falsely indicating to 911 that this was a disturbance and not a medical emergency.

90.     The 911 dispatcher also repeatedly asked Defendant Rutz about concern Ms. Gallegos would leave the facility or escape or "escalate" the supposed disturbance

24

(which was not a disturbance as Defendant Rutz knew), and throughout Defendant Rutz failed to correct the dispatcher, failed to clarify this was not an escape issue, it was a medical emergency, and failed to explain Ms. Gallegos was by then literally dying on the floor of ACRC.

91.     Based on Defendant Rutz's failures to accurately and completely describe the medical emergency to the 911 dispatcher, and her misstatements indicating police were needed instead of emergency medical, a police officer was initially dispatched to ACRC rather than EMTs or an ambulance.

92.     Meanwhile, Ms. Gallegos continued to convulse, seize, and slowly die in the ACRC office on the floor. At 12:04pm, video shows her body stiffen and back arch, as if convulsing onto the floor in pain and suffering.



93.     At 12:07pm, a Littleton police officer arrived to ACRC and observed Ms. Gallegos on the floor. He immediately recognized she was in a medical emergency,

showing how obvious Ms. Gallegos's life-threatening crisis was even for someone who did not know her or her SUD history. The police officer immediately called for medics, who were then dispatched. Due to the Individual Defendants' failure to call earlier or make clear the need for emergency care, no ambulance or EMT was dispatched prior to the Littleton police officer's request at 12:07pm, although Individual Defendants had the duty and ability to have called for over an hour prior to that point.



94.    By 12:08pm, EMTs and paramedics were on route to attempt to save Ms. Gallegos' life. They arrived to her body on the floor at 12:13pm, indicating it only took them about 5-6 minutes from being dispatched to arrive at the patient to attempt care.



95.    EMT/paramedics attempted to save Ms. Gallegos' life for the next 45 minutes. She was never revived to consciousness and was declared dead around 12:45pm at the scene.

**Defendants Knew Ms. Gallegos Was Suffering Drug Toxicity
And Needed Emergency Help**

96.    As the timeline alleged makes clear, the Individual Defendants knew Ms. Gallegos was suffering a serious, life-threatening medical emergency the morning of June 13. Their awareness of this only deepened and became more obvious from around 11:00am for the next hour, as Ms. Gallegos's symptoms increased and her need for emergency care became more and more obvious.

97.    Individual Defendants knew her symptoms were consistent with and likely methamphetamine toxicity, both due to that being Ms. Gallegos's drug of choice, and due to her symptoms of hyperactive, uncontrollable movements and other symptoms described herein.

27

98.    Individual Defendants knew methamphetamine, as an upper or stimulant, causes such hyperactive physical symptoms and agitation that Ms. Gallegos obviously manifested. In contrast, overdose from fentanyl or other depressant would look the opposite, with the patient "nodding out" or seeming to fall asleep, slowed breathing and heartrate.

99.    Individual Defendants knew methamphetamine overdose and/or toxicity is a serious health emergency and can cause substantial harm and death.

### Ms. Gallegos Would Be Alive Had Defendants Promptly Called For Emergency Medical Care

100.    Had Individual Defendants or other ACRC staff called for emergency medical care when it was obviously necessary, Ms. Gallegos would not have died on June 13, 2023.

101.    As the above timeline demonstrates, Defendants knew Ms. Gallegos was suffering drug toxicity, likely methamphetamine toxicity, as early as 11:00am that day. Had Defendants properly called for emergency help at 11:00am or anytime over the next 45 minutes or more, Ms. Gallegos would have survived.

102.    Methamphetamine toxicity, like what Ms. Gallegos experienced, causes a high heart rate and other symptoms. Emergency care prior to loss of consciousness through the injection of a depressant such as a benzodiazepine or other drug which will slow the heart rate and stabilize the patient, is standard. EMTs/paramedics are equipped to administer emergency drugs to save the life of a person suffering methamphetamine toxicity, to stabilize them for transport to a hospital emergency room.

28

Had Individual Defendants properly and promptly called 911 for an ambulance or emergency medical care, this basic treatment would have saved Ms. Gallegos's life.

103.    Because it only took EMTs/paramedics about 5-6 minutes to arrive to her after dispatch, even if Individual Defendants requested an ambulance or EMT as late as 11:50am (though they obviously should have called much earlier), the EMT/paramedic would have arrived by 11:57am, while Ms. Gallegos was still conscious and her heart beating, and emergency care would have saved her life.

104.    Alternatively, Defendants could have transported Ms. Gallegos to the emergency room at any point over the course of the hour she exhibited alarming symptoms and needed medical care, which would also have saved her life.

105.    Moreover, Individual Defendants knew Ms. Gallegos was suffering from a dangerous substance, at risk of overdose and toxicity, at around 11:00am, when Ms. Gallegos made statements indicating a substance was badly affecting her, and when her behavior and circumstances began to indicate she was suffering symptoms. Individual Defendants knew and should have known that under those circumstances it was excessively risky and dangerous to Ms. Gallegos's health to delay calling for emergency medical care immediately. Instead, they chose to wait around and watch her symptoms get worse and worse until it was too late to save her life.

**Autopsy And Toxicity Showed Ms. Gallegos Died A Preventable Death**

106.    A post-mortem report showed that Ms. Gallegos died from acute methamphetamine toxicity.

107.    A quantity of methamphetamine was absorbed over time into Ms.

Gallegos's bloodstream from a plastic baggie in her vagina containing the substance which was likely leaking. This absorption over time is an additional indicator that earlier medical intervention would have saved Ms. Gallegos's life, as alleged herein.

108.    Ms. Gallegos started showing symptoms of methamphetamine toxicity soon after a visit from her girlfriend around 11:00am. Defendants knew very well that a substance could have been brought into the facility and hidden in a bodily cavity, as commonly occurs in residential drug treatment facilities.

### GEO And ACRC's Failed Training, Policies, And Procedures Were The Moving Force Behind Ms. Gallegos's Death

109.    The horrific video of Ms. Gallegos's death shows ACRC staff watching as Ms. Gallegos slowly dies over the course of an hour. Individual Defendants' failure to act properly as gatekeepers to emergency care, and denial of care for an hour, and their failure to protect Ms. Gallegos from a known and obvious risk of serious suffering and death from drug intoxication, were caused by the constitutionally inadequate training, supervision, policies and procedures of GEO Defendants.

110.    First, GEO Defendants implemented a policy of failure to require or to train Defendants and ACRC staff to properly and promptly seek emergency care for a resident suffering a medical crisis.

111.    Second, GEO Defendants implemented a policy of failure to require or train ACRC staff to promptly and properly seek emergency medical care when a resident's symptoms are consistent with methamphetamine toxicity or overdose.

30

112.    Third, GEO Defendants implemented a policy failing to require ACRC staff to promptly and properly seek emergency medical care for either a medical necessity and/or a drug toxicity or overdose.

113.    Fourth, GEO Defendants implemented a policy of failure to train staff regarding how to properly call for and seek emergency care, failing to ensure staff know how to call 911 and what information to provide the 911 dispatcher to ensure prompt life-saving care is provided when obviously needed.

114.    Fifth, GEO Defendants implemented a policy and standard operating procedure of staff standing or sitting idly by and watching a person suffering a medical crisis and/or drug toxicity crisis as the symptoms worsen and increase until death.

115.    Sixth, GEO Defendants implemented a policy and standard procedure of failure to direct staff on how to properly respond to a suspected methamphetamine or other drug toxicity incident, and that such incidents require emergency medical care without delay.

116.    Seventh, GEO Defendants implemented a policy and standard procedure of delaying and denying emergency life-saving care, and of failing to require staff perform their role properly as gatekeepers to necessary medical care.

117.    The failed policies, procedures, training, customs, and supervision of GEO Defendants caused and was a moving force in the constitutional violations alleged and the death of Ms. Gallegos. Had Defendants GEO and ACRC implemented constitutional policies properly carried out by staff, Ms. Gallegos would not have died on June 13, 2023.

118.    Due to the actions and inaction of the Defendants and deliberate indifference as alleged herein, on June 13, 2023, Ms. Gallegos died from methamphetamine toxicity.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983—Fourteenth/Eighth Amendment—*Monell* Liability
### (Against Defendants GEO Group, CEC, and ACRC)

119.    Plaintiffs incorporate all other paragraphs of this Complaint as if fully stated herein.

120.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

121.    Ms. Gallegos was a person within the United States and Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

122.    Defendants, at all times relevant, were acting under color of state law in their actions and inaction.

123.    At all times relevant, Ms. Gallegos was serving a criminal sentence and had clearly established rights under the Eighth and Fourteenth Amendments to medical care and well-being, and to be free from deliberate indifference and reckless disregard for her life and safety as well as from cruel and unusual punishment. She also had clearly established due process rights under the Fourteenth Amendment to be protected

and kept safe.

124.    Defendant GEO Group (and its parent and affiliated entities) is a private corporation that subcontracted with the State of Colorado to care for and provide medical services to incarcerated individuals at the ACRC facility.

125.    As a result of the allegations contained in this Complaint, GEO, CEC, and ACRC are liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, customs, procedures, decision-making, and training that resulted in the violation of Ms. Gallegos's Fourteenth Amendment due process rights, including her right to be protected and kept safe, and Eighth Amendment rights, including the right to medical care, safety, and well-being while in custody and not be subjected to cruel and unusual conditions of confinement.

126.    GEO Defendants knew that these policies, customs, procedures, decision-making, and training, posed an excessive risk of serious harm to incarcerated individuals like Ms. Gallegos, and it was obvious that such serious harm would occur. Nevertheless, GEO Defendants failed to take reasonable steps to alleviate those substantial risks. There is an affirmative causal link between the deliberate indifference of the ACRC employees and jail staff towards Ms. Gallegos's protected rights and GEO Group's policies, procedures, customs, decision-making, and training described herein, which were also the moving force behind the unconstitutional conduct and the moving force resulting in Plaintiffs' injuries and damages, including Ms. Gallegos's death.

127.    GEO Defendants are liable under 42 U.S.C. § 1983 for the deliberate indifference and constitutional violations of individuals including without limitation the

Individual Defendants named in this lawsuit, as well as other non-named staff, employees and agents.

128.    GEO Defendants are liable under 42 U.S.C. § 1983 for the systemic violation of Ms. Gallegos's constitutional rights, in the alternative to and even if no individual defendant committed a constitutional violation (although Plaintiffs allege they did), because their failed policies, procedures, customs, practices, and training were a moving force in and in deliberate indifference to the substantial risk of death to Ms. Gallegos.

129.    In light of the duties assigned to their workers including the named Individual Defendants, the need for more or different training and supervision of them by GEO Defendants was so obvious and so likely to result in constitutional violations if unmet, that the failure to do so was deliberately indifferent to the rights of Plaintiffs and the relevant public, and was a moving force in the injuries and death of Ms. Gallegos.

130.    The unconstitutional acts and omissions of GEO Defendants were the moving force in the unconstitutional acts of individual staff and employees, and the moving force resulting in the injuries and damages suffered by Plaintiffs.

131.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiffs have suffered injuries and losses entitling them to recover compensatory and special damages, including for physical pain and suffering before and during death, loss of constitutional rights, loss of life, all in amounts to be proven at trial.

132.    Plaintiffs are entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, including prejudgment interests and costs as allowable by federal law.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983—Fourteenth/Eighth Amendments**
**(Against Individual Defendants Rutz, Talmadge, Frank, and Carter)**

133.    Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth herein.

134.    Ms. Gallegos was entitled to constitutional protections, and Defendants are persons for purposes of 42 U.S.C. § 1983.

135.    At all times relevant, Ms. Gallegos was an incarcerated person serving a post-adjudication sentence for a criminal conviction and had clearly established rights under the Eighth and Fourteenth Amendments to medical care and well-being, and to be free from deliberate indifference and reckless disregard for her health, safety, and life, and to be free from cruel and unusual punishment.

136.    At all times relevant, Individual Defendants knew of these clearly established constitutional rights of Ms. Gallegos, and knew that their conduct violated clearly established law, and that they are not entitled to qualified immunity.

137.    Individual Defendants' actions and inaction deprived Ms. Gallegos of her Constitutional rights, and Defendants were deliberately indifferent to known and excessive risks of serious harm and death to Ms. Gallegos.

138.    Individual Defendants were acting under color of state law at all times relevant to this action.

139.    Individual Defendants are individually liable to Plaintiffs for violation of 42 U.S.C. § 1983.

140.    Each of the Individual Defendants subjectively knew about and were

35

deliberately indifferent to the dangers posed, which they intentionally and deliberately disregarded; and, they knew of these excessive risks because they were obvious to them.

141.    Individual Defendants knowing conduct constituted deliberate indifference and willful and wanton disregard to the excessive, substantial risks of serious harm and death to Ms. Gallegos, depriving Ms. Gallegos of life's necessities and life itself, failing to provide Ms. Gallegos safe or humane conditions of confinement, failing to protect Ms. Gallegos's health, safety, and well-being, failing to serve in their role as gatekeepers to necessary care, and failing to provide necessary medical care, in violation of Ms. Gallegos's Eighth/Fourteenth Amendment rights, including the right not to be deprived of her life and to be free from cruel and unusual punishment.

142.    All Defendants had a special relationship with Ms. Gallegos as someone serving a community corrections residential sentence within their care, and owed a heightened duty of care to provide for the welfare of persons in their custody, including Ms. Gallegos.

143.    The acts or omissions of Individual Defendants were the legal and proximate cause and the moving force behind Plaintiffs injury and damages, and Ms. Gallego's endured pain, suffering and death as a result of the Individual Defendants' deliberate indifference.

144.    All of the deliberately indifferent acts of each Individual Defendant were conducted within the scope of their official duties and employment.

36

145.    Plaintiffs are entitled to and will seek punitive damages against Individual Defendants in that their actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Ms. Gallegos.

146.    Plaintiffs are entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest and costs as allowable by federal law.

**THIRD CLAIM FOR RELIEF**
**Wrongful Death/Negligence**
**(Against All Defendants)**

147.    Plaintiffs incorporate by reference the foregoing paragraphs of this complaint as if set forth fully herein.

148.    GEO Group, CEC, and ACRC, are private companies that contracted with Arapahoe County, who contracted with the State of Colorado, to provide residential services for individuals serving community corrections sentences within the ACRC facility.

149.    Individual Defendants were at all times relevant employed by GEO Defendants as professionals whose duties included being responsible for providing access to medical care, mental health care, monitoring the medical condition of incarcerated individuals, and other medical and mental health services.

150.    GEO Defendants are vicariously liable for the negligent acts and omissions by their agents and/or employees, including but not limited to Individual Defendants and other medical or other workers and agents, whether or not they are named Defendants.

151.    GEO Defendants and the Individual Defendants are private persons and entities for purposes of this claim, not public employees, and therefore are not entitled to immunity under the CGIA.

152.    Individual Defendants had duties of care to Ms. Gallegos, including to appropriately treat her SUD, evaluate and monitor Ms. Gallegos, to screen her for medical and mental health needs, to raise medical concerns with superiors and other appropriate staff, to ensure access to outside medical care including emergency medical care, to call for such emergency medical care when appropriate, and other legal duties to ensure the safety and welfare of Ms. Gallegos and others in ACRC.

153.    GEO Defendants had a duty to implement reasonable policies, customs, procedures, training, supervision, and decision-making, and to exercise reasonable care, regarding their employees working in ACRC, including Individual Defendants and other staff.

154.    Individual Defendants and other ACRC staff breached their duties of care when they knowingly, recklessly, and negligently failed to promptly and properly seek emergency medical care for Ms. Gallegos, placing her at risk for death or serious harm.

155.    GEO Defendants breached duties as articulated herein, and are vicariously liable for the reckless and negligent acts and omissions by their agents and/or employees, and other individuals not named herein. GEO Defendants are also directly liable for reckless and negligent failures in training, policies, practices, and supervision.

156.   GEO Defendants knew or should have known that the lack of supervision, training, and experience among their employees and agents was likely to harm individuals in their care and affected by their decisions, including Ms. Gallegos.

157.   In failing to exercise reasonable care to meet the duties described herein, GEO Defendants and Individual Defendants recklessly and negligently caused Plaintiff's injuries and damages including Ms. Gallegos's death. The reckless and negligent acts and omissions by Defendants also were a substantial and significant contributing proximate cause of the death of Ms. Gallegos's death and Plaintiffs' damages.

158.   As a direct and proximate result of Defendants' unlawful acts and omissions, Plaintiffs suffered damages, losses, and injuries in an amount to be determined by a jury at trial. These damages include, *inter alia*, pain and suffering, upset, grief, loss of society and companionship, anger, depression, and all other damages as allowed under the Colorado Wrongful Death Act.

159.   As a result of Defendants' acts and omissions as described herein, Plaintiffs suffered particularly grievous pain, suffering, and other damages as described above.

160.   Plaintiffs have suffered and continues to suffer economic and non-economic damages due to Defendants' reckless and negligent conduct toward Ms. Gallegos, including financial losses, non-economic damages for grief and suffering, loss of companionship, impairment in the quality of life, inconvenience, pain and suffering, and extreme emotional distress. Plaintiffs are therefore entitled to general and compensatory damages and to special damages.

161.    Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.

## VII. PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendants, and award Plaintiffs all relief as allowed by law and equity, including, but not limited to the following:

a)  Declaratory and injunctive relief, as appropriate;

b)  Actual economic damages as established at trial;

c)  Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of life and enjoyment of life, and other non-pecuniary losses;

d)  Punitive damages on all claims as allowed by law in an amount to be determined at trial against all applicable Defendants;[1]

e)  Issuance of an Order mandating appropriate equitable relief;

f)  Pre-judgment and post-judgment interest at the highest lawful rate;

g)  Attorney's fees and costs; and

h)  Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: June 10, 2025

---

[1] Plaintiffs also anticipate seeking punitive damages for the state law claims upon suitable amendment after completing substantial discovery.

Respectfully submitted,


*s/ Stephanie M. Frisinger*

David G. Maxted
Stephanie M. Frisinger
Hannah G. Dodson
MAXTED LAW LLC
1543 Champa Street Suite 400
Denver, CO 80202
dave@maxtedlaw.com
stephanie@maxtedlaw.com
hannah@maxtedlaw.com
303-353-1535

*Attorneys for Plaintiffs*