**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 25-cv-01816-NYW-KAS

THE ESTATE OF MONIQUE GALLEGOS, by and through personal representative ALBERT GALLEGOS,
DANESSA GARCIA-GALLEGOS, and
A.G. and Y.G., by and through next friend ALBERT GALLEGOS,

Plaintiffs,

v.

GEO GROUP, INC.,
COMMUNITY EDUCATION CENTERS, INC.,
ARAPAHOE COUNTY RESIDENTIAL CENTER,
KRISTIN RUTZ,
KRISTIN TALMADGE,
STEVEN FRANK, and
RAYDAWN CARTER,

Defendants.

---

## ORDER ON MOTION FOR PARTIAL DISMISSAL

---

This matter is before the Court on Defendant GEO's Motion for Partial Dismissal of Plaintiffs' First Amended Complaint ("Motion for Partial Dismissal" or "Motion"). [Doc. 55]. Plaintiffs have responded in opposition. [Doc. 57]. Defendant GEO Group, Inc. ("GEO") has replied. [Doc. 58]. The Court finds that oral argument would not materially assist in the disposition of the Motion. For the following reasons, the Motion is respectfully **GRANTED in part** and **DENIED in part**.

## BACKGROUND

The following facts are drawn from the First Amended Complaint and Jury Demand ("Amended Complaint"). [Doc. 45]. Plaintiffs allege that Monique Gallegos ("Ms.

Gallegos") "died a tragic and preventable death by methamphetamine toxicity" on June 13, 2023, "while in the care of the Arapahoe County Residential Center ('ACRC')." [*Id.* at ¶ 1]. ACRC is a "substance abuse residential reentry center" that provides services to persons serving criminal sentences who require substance abuse treatment. [*Id.* at ¶¶ 4, 36]. Arapahoe County contracted with the State of Colorado to provide these services, and GEO operates ACRC under a subcontract with Arapahoe County. [*Id.* at ¶ 34].

Ms. Gallegos was ordered to ACRC for substance abuse treatment in October 2022. [*Id.* at ¶¶ 29, 50]. She disclosed her substance abuse struggles to ACRC staff and notified them that her "drug of choice was . . . methamphetamine." [*Id.* at ¶ 50]. On June 10 and 11, 2023, Ms. Gallegos left ACRC on an overnight pass to visit her girlfriend's house. [*Id.* at ¶ 53]. She later admitted to ACRC staff that she used methamphetamine and fentanyl during this visit. [*Id.*]. She also reported that she had overdosed on drugs inside the ACRC facility around this time. [*Id.* at ¶ 54].

Around 10:30 a.m. on June 13, 2023, Ms. Gallegos's girlfriend visited her at ACRC. [*Id.* at ¶ 61]. Soon after her girlfriend arrived, Ms. Gallegos began exhibiting "alarming symptoms of drug toxicity." [*Id.* at ¶ 62]. These symptoms included "visible physical agitation and movement, obvious distress, hyperactivity, paranoia, [and] uncontrollable movement." [*Id.*]. Around 11:00 a.m., Defendant Kristin Rutz ("Defendant Rutz"), an ACRC employee, told another employee that she was concerned about Ms. Gallegos's behavior. [*Id.* at ¶ 63]. Ms. Gallegos stated to ACRC staff around this time that she had used drugs. [*Id.*]. Screenshots of video surveillance show that, over the course of about an hour, she interacted with ACRC staff while making signs of distress such as clenching her hands together and holding them over her mouth. [*Id.* at ¶¶ 63–77]. The employees

eventually escorted Ms. Gallegos to an office, where her symptoms continued. *See* [*id.* at ¶¶ 78–80]. Plaintiffs allege that Ms. Gallegos's "increasing symptoms" of distress, pain, and uncontrolled movement were an obvious "medical crisis, a substance toxicity event" that ACRC staff knew was consistent with methamphetamine toxicity or overdose. [*Id.* at ¶¶ 77–80, 96–98].

At 11:56 a.m., Defendant Rutz called 911. [*Id.* at ¶ 81]. Defendant Rutz initially requested "medical" but then stated that "police" were needed. [*Id.* at ¶ 83]. She described the situation as "a female here on some kind of drugs just out of control right now, just out of her mind, out out out," and told the dispatcher that Ms. Gallegos had admitted to using methamphetamine. [*Id.*]. The dispatcher confirmed that police—not medical personnel—were on their way, and Defendant Rutz did not request any medical personnel. [*Id.* at ¶¶ 86, 89]. At 12:07 p.m., a police officer arrived, recognized that Ms. Gallegos was suffering a medical emergency, and requested medical help. [*Id.* at ¶ 93]. EMTs and paramedics arrived at 12:13 p.m. but were unable to revive Ms. Gallegos, who was pronounced dead at 12:45 p.m. [*Id.* at ¶¶ 94–95]. A postmortem report showed that Ms. Gallegos died from "acute methamphetamine toxicity" resulting from a "plastic baggie in her vagina containing the substance which was likely leaking." [*Id.* at ¶¶ 106–07].

Plaintiffs are Ms. Gallegos's Estate, suing through her father, Albert Gallegos; her daughter, Danessa Garcia-Gallegos; and her minor children. [*Id.* at ¶¶ 13–15]. They bring three claims. First, Plaintiffs bring a municipal liability claim under 42 U.S.C. § 1983 against GEO, ACRC, and Defendant Community Education Centers, Inc. ("CEC"),[1]

[1] Plaintiffs and GEO previously filed a purported stipulation of dismissal as to ACRC and CEC. [Doc. 33]. Because ACRC and CEC had not signed the stipulation, the Court construed the filing as a motion for voluntary dismissal under Rule 41(a)(2) and dismissed

alleging violations of Ms. Gallegos's Eighth and Fourteenth Amendment rights ("Claim One"). [*Id.* at ¶¶ 134–47]. Second, they assert a similar § 1983 claim against Defendant Rutz and several other individual ACRC employees ("Claim Two"). [*Id.* at ¶¶ 23–26, 148–61]. Third, Plaintiffs bring a negligence and wrongful death claim against all Defendants ("Claim Three"). [*Id.* at ¶¶ 162–76].

Just one of these claims is at issue here. GEO's Motion for Partial Dismissal seeks dismissal only of Claim One, the municipal liability claim against GEO, pursuant to Rule 12(b)(6). [Doc. 55]. The Court limits its analysis accordingly and addresses the arguments below.

**LEGAL STANDARD**

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). A plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, "a complaint must contain sufficient factual

---

Plaintiffs' claims against these Defendants *without prejudice*. [Doc. 40]; Fed. R. Civ. P. 41(a)(2). Plaintiffs then filed their Amended Complaint, which lists ACRC and CEC as defendants in the caption, names them as parties, and specifically asserts claims against them. *See* [Doc. 45 at 1; *id.* at ¶¶ 17–18, 134–47]. And while GEO believes ACRC and CEC "were included in the caption in error," [Doc. 55 at 2 n.1], the Parties continue to list ACRC and CEC as defendants in their briefing, *see* [*id.* at 1; Doc. 57 at 1; Doc. 58 at 1]. From this, the Court can only conclude that, at this juncture, CEC and ACRC remain as Parties to the case.

matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). The Court must ultimately "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

**ANALYSIS**

Under 42 U.S.C. § 1983, municipalities may be held liable for constitutional violations caused by their policies or customs. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). *Monell* liability "extend[s] to private entities acting under color of state law," including contractors. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 (10th Cir. 2023) (quotation omitted). GEO does not dispute that it acted under color of state law when operating ACRC, *see* [Doc. 55], so the Court proceeds to the substance of Plaintiffs' claim. To state a municipal liability claim against GEO, Plaintiffs must plausibly allege "(1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring." *George ex rel. Bradshaw v. Beaver Cnty.*, 32 F.4th 1246, 1253 (10th Cir. 2022) (citation omitted).

Plaintiffs' *Monell* claim encompasses three theories of liability. *See* [Doc. 57 at 10–20]. First, they allege that GEO failed to adopt policies requiring its employees to promptly seek emergency medical care for residents experiencing a drug overdose or other medical emergency. [*Id.* at 10–12; Doc. 45 at ¶¶ 110–12]. Second, Plaintiffs claim that GEO failed to train its employees on how to handle these situations, including when and how to seek emergency care when necessary. [Doc. 57 at 12–16; Doc. 45 at ¶¶ 110–

13]. Third, Plaintiffs allege that GEO maintained informal customs or practices of delaying a response to a drug overdose or other medical emergency. [Doc. 45 at ¶¶ 114–16].

Plaintiffs' first theory presents a threshold question of whether a failure to adopt a policy can provide a basis for *Monell* liability. The Court answers that question in the affirmative. And because the Court concludes that Plaintiffs' failure-to-adopt-policy theory is subject to the same standards as a failure-to-train theory, the Court analyzes these theories together. The Court then turns to Plaintiffs' informal custom theory.

## I. Failure to Adopt a Policy Provides a Basis for *Monell* Liability

The first *Monell* element requires a municipal policy or custom. This includes "a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). A municipality's "failure to act" may provide a basis for liability so long as the failure was accompanied by deliberate indifference. *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)); *see also, e.g.*, *Barney v Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (recognizing that a municipality may be liable for its "failure to act" (citation omitted)).

GEO argues that Plaintiffs' references to a "failure" to adopt policies do not state a plausible *Monell* claim. [Doc. 55 at 10–11]. In GEO's view, alleging a lack of a policy cannot "transform individual actions or inactions [into municipal] actions or inactions." [Doc. 58 at 4]. And GEO appears to question whether "the lack of a policy may form the basis for a *Monell* claim." [*Id.*]. Plaintiffs counter that the "lack of a particular written policy

or protocol" may support a *Monell* claim and that they have plausibly alleged such a deficiency. [Doc. 57 at 10–11].

The Court respectfully agrees with Plaintiffs that a municipal entity's failure to adopt a policy can sustain a *Monell* claim. The Supreme Court has explained that a "city's 'policy of inaction' in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (cleaned up). To that end, the Tenth Circuit has long recognized claims based on "systemic" policy failures. *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1185–86 (10th Cir. 2020) (reaffirming the viability of systemic failure claims and describing *Garcia v. Salt Lake County*, 768 F.2d 303 (10th Cir. 1985), as holding that "where the county's policy, or lack of policies, evinces deliberate indifference, the county can be liable even in the absence of individual liability by any county actor"). And despite facing various iterations of failure-to-adopt-policy claims, the Circuit has not rejected these claims on the "policy or custom" element and instead treated them as on equal footing with established theories like failure-to-train. *See*, *e.g.*, *Hinton*, 997 F.2d at 782 (rejecting claim challenging a "city's failure to train adequately its officers and to adopt written regulations governing the use of force" for failure to identify an underlying constitutional violation); *Barney*, 143 F.3d at 1309 & n.8 (dismissing challenges to both hiring decision and "fail[ure] to adopt various policies" on deliberate indifference grounds, without distinguishing between these theories); *N.E.L. v. Douglas Cnty.*, 740 F. App'x 920, 933–34 (10th Cir. 2018) (analyzing failure-to-adopt-policy and failure-to-train theories together and rejecting both on deliberate indifference grounds).

None of these cases marks a boundary on what kinds of failures to act by a municipality can constitute a "policy or custom" for *Monell* purposes. To be sure, failure-to-act claims face a strict inquiry at the second and third elements. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) (emphasizing that "rigorous standards of culpability and causation must be applied"). At this first element, though, the Court concurs with the ample persuasive authority holding that a failure to adopt a policy can serve as a basis for municipal liability. *See, e.g.*, *Est. of Janota v. Love Cnty. Bd. of Comm'rs*, 830 F. Supp. 3d 1133, 1144 (E.D. Okla. 2026) ("Failure to adopt a policy or custom can form the basis of section 1983 liability as well." (citing *Barney*, 143 F.3d at 1308)); *Paugh v. Uintah Cnty.*, No. 2:17-cv-01249-JNP-CMR, 2020 WL 4597062, at *37 & n.21 (D. Utah Aug. 11, 2020) (approving a "failure-to-adopt-a-policy claim for municipal liability" and collecting out-of-circuit cases that have done the same); *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) ("A failure to adopt a policy can be deliberately indifferent . . . ." (quotation omitted)); *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 390 (8th Cir. 2007) (en banc) (recognizing that "a municipality's failure to adopt adequate safeguards" triggers liability if it resulted from deliberate indifference). These cases, taken together, are sufficient, even though Plaintiffs have provided no cases—nor has the Court located any—in which the Supreme Court or Tenth Circuit expressly approved a *Monell* claim based on a failure to adopt a particular policy. *Monell* requires only an "official municipal policy of some nature," 436 U.S. at 691, and liability for a municipality's failure to act is well-established.

### A. The Same Standards Govern Plaintiffs' Failure-to-Adopt-Policy and Failure-to-Train Theories

The Court further concludes that Plaintiffs' failure-to-adopt-policy theory is subject to the same standards as a failure-to-train theory. The standards for failure-to-train claims generally apply to other types of supervisory claims. *See Whitewater v. Goss*, 192 F. App'x 794, 797 (10th Cir. 2006) (collecting cases); *see also, e.g.*, *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (reciting deliberate indifference standard as it applies to "claims of inadequate hiring, training, or other supervisory practices"). Indeed, as the Tenth Circuit observed in *Whitewater*, these theories are often "indistinguishable." 192 F. App'x at 797; *see also Jackson v. City of Cleveland*, 925 F.3d 793, 828 n.20 (6th Cir. 2019) (declining to address failure-to-train and failure-to-adopt-policy theories separately and observing that "the harm alleged and the analysis required under the failure-to-train theory are functionally indistinguishable" from the failure-to-adopt-policy theory).

That is the case here: the critical allegations underlying Plaintiffs' failure-to-train and failure-to-adopt-policy theories are one and the same. *See* [Doc. 45 at ¶¶ 110–12]. Under either theory, Plaintiffs allege that GEO failed to take action—be it through training or mandatory policies—that instructed employees to respond to a resident's drug toxicity or overdose by promptly seeking emergency medical care. [*Id.*]. In other words, the crux of Plaintiffs' claim is that GEO failed to prepare ACRC staff "to handle recurring situations presenting an obvious potential to violate the Constitution." *Lance v. Morris*, 985 F.3d 787, 801 (10th Cir. 2021). The framework for failure-to-train and failure-to-supervise claims aims to assess deliberate indifference (along with the other *Monell* elements) in exactly this situation, *see id.* at 801–02, and the Court concludes that this rubric is equally

useful for evaluating Plaintiffs' failure-to-adopt-policy theory. Thus, given the overlap in Plaintiffs' failure-to-train and failure-to-adopt-policy theories, the Court analyzes these theories together and under the same standards.

## II. Failure-to-Adopt-Policy and Failure-to-Train Theories

### A. Official Policy or Custom

While Plaintiffs' failure-to-adopt-policy and failure-to-train theories may provide a basis for *Monell* liability, the Court still must determine whether Plaintiffs have adequately alleged such theories. Failure-to-act claims require plaintiffs to allege "a specific deficiency" in municipal policies or programs that is "closely related to [the] ultimate injury." *Keith v. Koerner*, 843 F.3d 833, 839 (10th Cir. 2016) (quotation omitted); *see also Jensen v. Lane*, No. 23-cv-01783-DDD-SBP, 2024 WL 7005993, at *4 (D. Colo. Mar. 26, 2024) (collecting cases and applying this requirement to multiple failure-to-act theories in deciding a motion to dismiss).

***Failure to Adopt Policies.*** The Court finds that Plaintiffs have identified a specific deficiency by alleging that GEO failed to require ACRC staff to "promptly and properly seek emergency medical care" for a resident suffering from drug toxicity or overdose, specifically "when a resident's symptoms are consistent with methamphetamine toxicity or overdose." [Doc. 45 at ¶¶ 111–12]. These allegations, combined with allegations regarding ACRC staff's delay in seeking medical care for Ms. Gallegos, plausibly allege that GEO failed to adopt a policy requiring its staff to promptly seek emergency care for a resident showing symptoms of a methamphetamine overdose. *See Walker v. Zepeda*, No. 11-cv-01242-DME-CBS, 2012 WL 13285403, at *5 (D. Colo. May 29, 2012) (concluding that plaintiff had stated a claim for inadequate training or supervision by

"alleg[ing] additional, specific facts" about police officers' conduct "within the scope of their official duties and employment" during the incident at issue).

GEO contends that Plaintiffs should have "set out the text" of the relevant policy. [Doc. 55 at 10 (quoting *Leonhard v. Correct Care Sols., LLC*, No. 19-cv-00600-PAB-STV, 2020 WL 1694377, at *8 (D. Colo. Apr. 7, 2020))]. But *Leonhard* involved allegations of an expressly "unconstitutional policy." 2020 WL 1694377, at *8. Plaintiffs do not allege that GEO's policies were unconstitutional on their face or directed ACRC staff to commit constitutional violations. *See Brown*, 520 U.S. at 404–07 (distinguishing claims where "the municipal action itself violated federal law, or directed or authorized the deprivation," from claims involving a "facially lawful municipal action"). In the failure-to-act context, determining whether a municipality's training programs, supervisory practices, or overall policies regarding medical emergencies were so inadequate as to give rise to liability entails more than simply reading the text of one policy. And Plaintiffs, as "outsider[s] to municipal government," are "not expected to have information about a city's official policies, practices, or training programs at the pleading stage." *Walker*, 2012 WL 13285403, at *5 (collecting cases); *Jolliff v. Rogers Cnty. Sheriff's Dep't*, No. 4:24-cv-00065-JCG-SH, 2025 WL 1570005, at *5 (N.D. Okla. June 3, 2025) (denying motion to dismiss where plaintiffs "ha[d] not pointed to a specific policy" but had provided sufficient allegations to infer a policy deficiency, and observing that "[i]t is unlikely that Plaintiff would possess sufficient knowledge of the Sheriff's Office's internal policies and customs prior to discovery").[2]

[2] Moreover, the Court notes that had GEO submitted its policies regarding medical emergencies or drug overdoses along with its Motion, those policies very likely would be properly considered at this stage. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*,

The Court respectfully concludes that Plaintiffs have plausibly alleged an "official policy or custom" based on a failure to adopt policies requiring ACRC staff to promptly seek medical care for an inmate displaying symptoms of methamphetamine toxicity or overdose.

***Failure to Train.*** For similar reasons, the Court finds that Plaintiffs sufficiently allege inadequate training. Plaintiffs allege that GEO failed to train its employees to promptly seek medical help for residents showing signs of methamphetamine toxicity or overdose. [Doc. 45 at ¶¶ 111–12]. This identifies a specific training deficiency closely related to Plaintiffs' injuries. *See Keith*, 843 F.3d at 839; *see also, e.g.*, *Schwartz ex rel. Est. of Finn v. City & Cnty. of Denver*, 2023 WL 1879305, at *5 (D. Colo. Feb. 10, 2023) (denying motion to dismiss where plaintiff "specifie[d] the exact factual circumstance about which the City failed to provide any training," namely "the appropriate use of force against spitting detainees"). The cases cited by GEO, by contrast, involved allegations that identified only a general training deficiency. *See* [Doc 55 at 12–14]; *see also, e.g.*, *Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1072 (D. Colo. 2021) (describing allegations that city failed to "provide further training . . . on the necessity of not retaliating against [protesters] . . . [and] establishing probable cause before making an arrest"); *Est. of Strong v. City of Northglenn*, No. 17-cv-01276-WJM-MEH, 2018 WL 1640251, at *7 (D. Colo. Apr. 5, 2018) (dismissing failure-to-train claims where plaintiffs alleged only that cities failed to train police officers "'on the use of excessive force' and

---

130 F.3d 1381, 1384 (10th Cir. 1997) (holding that, in deciding a motion to dismiss, a court may consider a document outside the complaint if it "is referred to in the complaint and is central to the plaintiff's claim"). Otherwise, the Court—and GEO—are limited to the facts alleged in the Amended Complaint. *See id.*

also 'on the execution of no-knock warrants'"). Plaintiffs thus plausibly allege the existence of a training program that failed to prepare ACRC staff to decide when to seek emergency medical care for a resident suffering from methamphetamine toxicity or overdose.[3]

### B. Causation

At the causation element, Plaintiffs must plausibly allege "a direct causal link between the policy or custom and the injury alleged." *Waller*, 932 F.3d at 1284 (quotation omitted). "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider*, 717 F.3d at 770 (quotation omitted). And the "identified deficiency" in municipal policies or programs still "must be closely related to the ultimate injury." *City of Canton*, 489 U.S. at 391 (framing the inquiry as whether the injury would have been "avoided had the employee been trained under a program that was not deficient in the identified respect").

In GEO's view, Plaintiffs' theory "that an individual acts or fails to act because there is no policy directing such action is simply too tenuous to support liability." [Doc. 58 at 4]. The Court respectfully disagrees. Plaintiffs have alleged that if ACRC employees were required by policy to promptly seek medical help for residents showing signs of drug

[3] GEO further argues that if Plaintiffs assert any theory of failure to supervise, that theory would fail at this step due to a lack of allegations identifying "specific, alleged deficiencies in supervision." [Doc. 55 at 15]. The Amended Complaint contains only a few conclusory references to inadequate supervision of ACRC staff, without articulating any specific deficiencies. *See* [Doc. 45 at ¶¶ 132, 144, 170–71]. In their response brief, Plaintiffs do not acknowledge this issue or claim to assert a failure-to-supervise theory. *See* [Doc. 57]. The Court need not make Plaintiffs' arguments for them, *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015), and respectfully **GRANTS** the Motion insofar as it challenges a failure-to-supervise theory.

toxicity or overdose, they would not have waited approximately an hour to call 911 regarding Ms. Gallegos's condition. [Doc. 45 at ¶¶ 100–05]. There are no allegations that ACRC staff would be unlikely to follow these policies if they were in place. Accordingly, the Court respectfully concludes that Plaintiffs sufficiently allege a direct causal link between the alleged policy deficiency and their injuries. And while it is unclear whether GEO challenges causation as to the failure-to-train theory, *see* [Doc. 58 at 7–10 (stating in a heading that any training deficiency could not be a "moving force," but raising arguments only as to deliberate indifference)], the Court reaches the same conclusion for that theory too.

### C. Deliberate Indifference

When challenging a "facially lawful municipal action," a plaintiff must allege that "the municipal action was taken with deliberate indifference as to its known or obvious consequences." *Brown*, 520 U.S. at 407 (quotation omitted). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307 (citation omitted). This ordinarily requires a pattern of similar constitutional violations. *Connick*, 563 U.S. at 62. But in "a narrow range of circumstances," a plaintiff may establish deliberate indifference based on a single incident. *Waller*, 932 F.3d at 1285 (quotation omitted).

Plaintiffs claim that "this is not a 'single incident' case" because they have alleged two prior deaths at GEO facilities in Colorado. [Doc. 57 at 12]; *see* [Doc. 45 at ¶¶ 127–30]. First, Plaintiffs allege that a man died in November 2017 after suffering a "medical

crisis" at a GEO facility, where staff failed to promptly call 911 even after he showed "life-threatening symptoms." [Doc. 45 at ¶ 127]. Second, they allege that another man died in 2022, after GEO staff failed to "promptly or properly call 911" and, when they finally did call, "failed to provide basic information including the nature of the medical emergency." [*Id.* at ¶ 129]. Plaintiffs do not specify whether either of these deaths were drug related or whether they occurred at a facility similar to ACRC. Even assuming that these previous incidents were sufficiently similar, however, the Court respectfully disagrees that two incidents in approximately seven years is a sufficient pattern of constitutional violations to establish GEO policymakers' deliberate indifference in June 2023. *See, e.g.*, *Contreras ex rel. A.L. v. Dona Ana Cnty. Bd. of Cnty. Comm'rs*, No. 18-cv-00156-GBW-GJF, 2018 WL 5832152, at *14 (D.N.M. Nov. 7, 2018) (finding no deliberate indifference based on two prior incidents in 28 months); *Bowman v. City of Flint*, No. 21-cv-12845, 2025 WL 848135, at *2 n.1 (E.D. Mich. Mar. 18, 2025) (observing that two other civil rights lawsuits against police officer could not establish a pattern of conduct for deliberate indifference purposes); *Boyd-Nordstrom v. Baker*, No. 5:25-cv-00096, 2026 WL 2041475, at *5, *7 (W.D. Va. July 14, 2026) (concluding that "[t]wo isolated incidents of misconduct are insufficient" to allege deliberate indifference (collecting cases)).

In the alternative, Plaintiffs contend that they have alleged deliberate indifference based on the single incident of Ms. Gallegos's death. [Doc. 57 at 14–16]. Deliberate indifference may be established from a single incident only "where a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Waller*, 932 F.3d at 1284 (quotation omitted). In the supervisory context, the Tenth Circuit has adopted a three-part test for single-incident deliberate indifference:

(1) "the municipality's policymakers know to a moral certainty that their employees will confront a given situation"; (2) "the situation presents the employee with a difficult choice of the sort that training or [additional policies] will make less difficult"; and (3) "the wrong choice will frequently cause the deprivation of a citizen's constitutional rights." *Valdez v. Macdonald*, 66 F.4th 796, 817 (10th Cir. 2023) (cleaned up); *see Lance*, 985 F.3d at 802 (adopting this test from *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)).

Plaintiffs have plausibly alleged facts that meet this test. First, Plaintiffs allege that GEO policymakers knew to a moral certainty that staff at a drug rehabilitation center would confront residents displaying signs of drug exposure, toxicity, or overdose. *See, e.g.*, [Doc. 45 ¶¶ 122–24]. ACRC was specifically tailored to residents struggling with substance abuse, [*id.* at ¶¶ 4, 35–36, 41], and it was "inevitable" that overdose incidents would occur, [*id.* at ¶ 122]. GEO argues that this situation is distinguishable from ordinary drug abuse, because Ms. Gallegos's drug exposure stemmed from a leaking "baggie containing drugs she had secreted inside her person." [Doc. 58 at 10]; *see* [Doc. 55 at 14]. But there are no allegations that the assessment of overdose symptoms or decision to seek medical care would be different for someone who has been exposed in this manner, as opposed to someone who overdoses after taking drugs via injection or some other route. To the extent GEO contends that Ms. Gallegos's circumstances were so unique as to present an entirely different "situation" from other overdoses, it may press that argument at a later stage.

As for the second requirement, courts have repeatedly recognized that the decision to seek medical care is the sort of "difficult choice" that additional guidance—whether in the form of training, supervision, or written policies—makes less difficult. *See,*

*e.g.*, *Lance*, 985 F.3d at 802 ("[A] factfinder could reasonably determine that training would have helped jail guards make the difficult decision of whether to call the nurse [to assess an inmate's pain complaint]."); *Jolliff*, 2025 WL 1570005, at *5 ("Because judging the severity of a medical complaint can be challenging, training and proper supervision would benefit Jail staff in triaging detainee complaints and injuries."); *Stella v. Davis Cnty.*, No. 23-4122, 2024 WL 4764694, at *9 (10th Cir. Nov. 13, 2024) ("[A] factfinder could likewise have reasonably determined that written nursing protocols and training would help the County's nurses determine whether a patient at high-risk of internal bleeding needed to be monitored longer or taken to a doctor or hospital."). Thus, Plaintiffs have plausibly alleged that training or policies about when to seek medical care for a resident showing symptoms of drug toxicity or overdose would have helped ACRC staff make that difficult decision. [Doc. 45 at ¶¶ 110–12; Doc. 57 at 16].

But Plaintiffs also allege that GEO should have trained ACRC staff on "how to call 911 and what information to provide the 911 dispatcher." [Doc. 45 at ¶¶ 113, 121]. They do not explain why, once the decision to seek help is made, staff then face additional difficult decisions about how to seek that help and what information to provide. The Court respectfully disagrees that knowing how to call 911 and describe the situation to the dispatcher requires anything "more than the application of common sense." *Walker*, 974 F.2d at 297. Plaintiffs fail to plausibly allege that additional training or policies on this point would have helped ACRC staff with any difficult decisions.

Focusing only on the alleged lack of training and policies regarding when to seek medical help, the Court concludes that Plaintiffs also satisfy the third requirement for single-incident deliberate indifference. The decisions holding that additional guidance

about when to seek medical care would help with a difficult choice have also concluded that the wrong choice in that situation is likely to result in a constitutional violation. *Lance*, 985 F.3d at 803; *Jolliff*, 2025 WL 1570005, at *5; *Stella*, 2024 WL 4764694, at *9. The Court agrees with Plaintiffs that the alleged lack of policies and training on when to seek medical care for overdose symptoms could plausibly lead to frequent disregard of such symptoms, "violating [residents'] constitutional right to medical care." *Stella*, 2024 WL 4764694, at *9 (quoting *Lance*, 985 F.3d at 803). Plaintiffs thus meet all three requirements for single-incident deliberate indifference at this stage.

In sum, Plaintiffs have adequately alleged the elements of *Monell* liability as to their theories that GEO failed to adopt policies or train ACRC staff on promptly seeking medical care for residents showing signs of drug overdose or toxicity. The Motion is respectfully **DENIED** on this basis. The Motion is respectfully **GRANTED**, however, with respect to any failure-to-supervise theory or a failure-to-train theory premised on a lack of training on "how to call 911."

## III. Informal Custom or Practice

Plaintiffs' final theory of *Monell* liability is that GEO maintained a "policy and standard operating procedure" of delaying in seeking medical care for a resident suffering from drug overdose or toxicity. [Doc. 45 at ¶¶ 114–16]. Plaintiffs do not allege that this resulted from a formal, written policy, and their response brief makes clear that this is an informal "practice or custom" theory. *See* [Doc. 57 at 17–20]. GEO argues that Plaintiffs fail to plausibly allege the existence of an informal custom. [Doc. 55 at 11–12].

An informal custom constitutes a municipal policy when it "amount[s] to a widespread practice that, although not authorized by written law or express municipal

policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (cleaned up). "In order to establish a custom, the actions of the municipal employees must be continuing, persistent and widespread." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (quotation omitted); *see also Ward v. City of Hobbs*, 398 F. Supp. 3d 991, 1038–39 (D.N.M. 2019) (explaining that "widespread" misconduct "involve[s] a 'series of decisions'" (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 130 (1988) (plurality opinion)). To meet this standard, "the plaintiff can plead a pattern of multiple similar instances of misconduct; 'no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible.'" *Arakji v. Hess*, No. 15-cv-00681-CMA, 2015 WL 7755975, at *6 (D. Colo. Dec. 2, 2015) (quoting *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015)); *cf. Carney*, 534 F.3d at 1274 (observing, at summary judgment, that plaintiffs "most commonly" establish a custom by "offer[ing] evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way").

At the outset, the Court respectfully disagrees with Plaintiffs that they have alleged a pattern of prior similar violations. [Doc. 57 at 18–20]. Plaintiffs again point to prior incidents at GEO facilities in Colorado in 2017 and 2022 that involved "delayed and then botched 911 calls." [*Id.* at 19; Doc. 45 at ¶¶ 127, 129]. As explained above, Plaintiffs do not allege that these incidents were especially similar to Ms. Gallegos's overdose at a substance abuse reentry center, either in terms of the particular facility or the medical emergency that occurred. In any event, the Court concurs with the weight of persuasive

authority that two prior incidents in seven years is insufficient to establish a "widespread" and "permanent" municipal custom. *See Est. of Burnett v. City of Colorado Springs*, 763 F. Supp. 3d 1281, 1288 (D. Colo. 2025) (collecting cases), *appeal docketed*, No. 25-1052 (10th Cir. Feb. 11, 2025); *Ward*, 398 F. Supp. 3d at 1041–42 (collecting cases for the proposition that "two or three instances will not suffice" to establish a practice or custom); *cf. Est. of Valverde ex rel. Padilla v. Dodge*, No. 16-cv-01703-MSK-MEH, 2017 WL 3530282, at *4 (D. Colo. Aug. 17, 2017) (concluding that three similar incidents within two years plausibly established a custom (citing First Amended Complaint at ¶ 34, *Est. of Valverde*, No. 16-cv-01703-MSK-MEH, ECF No. 27)).

Plaintiffs are correct that, in a few cases, courts have found a municipal custom absent a pattern of prior misconduct. But the cases they rely on are readily distinguishable. First, they cite *Asten v. City of Boulder*, 652 F. Supp. 2d 1188, 1210 (D. Colo. 2009). [Doc. 57 at 17–18]. In *Asten*, the plaintiff alleged that specific citywide training practices for police officers affirmatively created a custom and culture of using excessive force. 652 F. Supp. 3d at 1209–10. There are no such allegations here—indeed, Plaintiffs' other theories depend on the alleged absence of training and official guidance to ACRC staff regarding overdose incidents.

Next, Plaintiffs cite *Bass v. Pottawatomie County Public Safety Center*, 425 F. App'x 713, 716 (10th Cir. 2011), for the proposition that a custom may arise from "informally allowing violations of written policy," [Doc. 57 at 18]. Yet the Amended Complaint identifies no written policies that were violated. Plaintiffs instead rely on GEO's contract with Arapahoe County, which they say included "a written commitment to ensure safety of residents in ACRC, including adequate supervision and access to emergency

medical care." [*Id.*; Doc. 45 at ¶¶ 20, 43–45]. To start, Plaintiffs' position that ACRC staff violated GEO's municipal contract is a legal conclusion the Court cannot accept as true. *See Iqbal*, 556 U.S. at 678. And even assuming GEO's broad contractual commitment to provide adequate medical care constitutes an internal policy binding on ACRC staff, *Bass* is still distinguishable.

*Bass* involved a plaintiff who was detained overnight in a county jail's "drunk pod" and assaulted by another detainee. 425 F. App'x at 715, 720. The assault occurred while detainees were left unsupervised, in violation of "policies requiring close supervision of unclassified [in terms of dangerousness] detainees." *Id.* at 720. On the night the plaintiff was assaulted, the on-duty officer's job duties forced him to rely on the booking clerk to supervise detainees through a television monitor, and the booking clerk's job duties prevented her from looking at the monitor more than "occasionally." *Id.* at 721. While there was no evidence of prior similar incidents, *id.* at 720 n.2, the Tenth Circuit found that these individuals' conduct "reflected the Jail's relevant supervision practices because . . . their conduct was a function of the official job duties assigned to them," *id.* at 721 n.4. Plaintiffs do not explain why ACRC staff's delay in seeking medical care for Ms. Gallegos was caused by their official job duties. To the contrary, the factual allegations suggest that there was nothing impeding ACRC staff from obtaining timely medical care for Ms. Gallegos—staff simply stood "idly by and watch[ed] [Ms. Gallegos] suffer[] a medical crisis" without intervening. [Doc. 45 at ¶ 114].[4]

---

[4] Plaintiffs also assert that *Simmons v. Uintah Health Care Special District*, 506 F.3d 1281 (10th Cir. 2007), supports their claim that GEO informally allowed ACRC staff to violate policies, [Doc. 57 at 18]. *Simmons* holds that municipal liability may arise from "actions by final policymakers taken in defiance of a policy or custom that they themselves adopted." 506 F.3d at 1285. An action by a final policymaker is a different type of

Plaintiffs therefore fail to allege that ACRC staff's conduct reflected a "widespread" and "permanent" custom established through repeated conduct, top-down training policies, or official job duties. Accordingly, they cannot satisfy the initial "policy or custom" element of a *Monell* claim, *see George*, 32 F.4th at 1253, and the Court need not reach the remaining elements. The Motion is respectfully **GRANTED** as to Plaintiffs' informal custom theory of municipal liability.

**CONCLUSION**

For the reasons stated herein, **IT IS ORDERED** that:

(1) Defendant GEO's Motion for Partial Dismissal of Plaintiffs' First Amended Complaint [Doc. 55] is respectfully **GRANTED in part** and **DENIED in part** as set forth herein;

(2) Plaintiffs' *Monell* claim against GEO is **DISMISSED without prejudice**[5] to the extent they assert theories based on failure to supervise, failure to train staff on how to seek medical help, or informal custom or practice; and

(3) The initial version of GEO's Motion, [Doc. 51], is **DENIED as moot**.

DATED: August 18, 2026

BY THE COURT:

Nina Y. Wang
United States District Judge

---

municipal "policy or custom" than an informal custom or practice. *See Bryson*, 627 F.3d at 788. So *Simmons* provides little guidance in assessing whether Plaintiffs have adequately alleged a widespread informal custom.

[5] Dismissal with prejudice is appropriate only "where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006). While GEO requests a dismissal with prejudice, it does not explain why amendment would be futile. *See* [Doc 55 at 16]. The Court need not make GEO's arguments for it. *Davis*, 622 F. App'x at 759.